**Hearold LACY, Plaintiff,**

**v.**

**AMERITECH MOBILE COMMUNICATIONS, INC., Defendant.**

**No. 95 C 3061.**

United States District Court, N.D. Illinois, Eastern Division.

April 30, 1997.

Donald E. Casey, Springer, Casey, Dienstag & Silverman, P.C., Karen Fay Botterud, Chicago, IL, for plaintiff.

Hearold Lacy, Maywood, IL, pro se.

David Brian Ritter, Janet M. Kyte, Joseph R. Vallort, Altheimer & Gray, Chicago, IL, Kristen Wenstrup Crosby, Mayer, Brown & Platt, Chicago, IL, for defendant.

### MEMORANDUM OPINION AND ORDER

COAR, District Judge.

Defendant Ameritech Mobile Communications, Inc. ("defendant," "Ameritech Cellular," or "the company") has moved for summary judgment on plaintiff Hearold Lacy's ("plaintiff" or "Lacy") complaint alleging race discrimination, sex discrimination, sexual harassment, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). For the following reasons, the motion will be granted.

### I. Factual Background

#### A. The Parties

Defendant, Ameritech Cellular, is in the business of providing cellular telephone, paging, and other communications services throughout the Midwest. (12(M) Stmt., ¶ 1). In December 1990, Ameritech Cellular hired plaintiff, Hearold Lacy, as a customer service representative ("CSR"). (12(M) Stmt., ¶ 14). Lacy is an African–American male. (Am. Compl., ¶ 1).

In order to perform their jobs, CSRs generally sat in cubicles in front of computer terminals and wore headsets to answer telephone inquiries from customers. (12(M) Strnt., ¶ 4). CSRs were expected to follow the daily and weekly schedule, which specified start times, break times, lunch periods, and ending times. CSRs were permitted an hour for lunch and a 15–minute break in the morning and afternoon. (12(M) Stmt., ¶ 5). The schedule also incorporated "downtime" (one-half hour in the morning and afternoon), during which CSRs could do paperwork and make follow-up calls to customers. (12(M) Strut., ¶ 7). When not on break, at lunch, on

downtime, or on an approved project, CSRs were required to be "on-line" and ready to take customer telephone calls. If a CSR needed to leave his desk when he was scheduled to be taking customer calls, he was expected to contact the daily "duty manager" (unless he was leaving his cubicle to perform customer service functions for a customer who was currently on the line). (12(M) Stmt., ¶ 8; 12(N) Resp., ¶ 8). An important part of a CSR's job was following the schedule. If a CSR was late for work or did not otherwise follow the schedule, it hindered the company's ability to efficiently answer customer questions. (12(M) Stmt., ¶ 9).

Each CSR reported to a customer service manager. Each customer service manager supervised a group of ten to fifteen CSRs. The customer service managers would occasionally monitor the calls handled by the CSRs. (12(M) Stmt., ¶¶ 10, 12). Lacy was directly supervised by the following customer service managers: Minnie Hundley (December 1990 to February 1991), Carolyn Mitchell (February to May 1991), Joe Schnaufer (May 1991 to June 1992), and Tim Riordan (June to November 1992). The customer service managers reported to Rita Smith, assistant director of customer service. Smith reported to Robert Leger, director of customer service. (12(M) Stmt., ¶¶ 13, 16).

## B. Plaintiff's Job Performance [1]

Lacy understood that it was important to follow the work schedule set by the company. (12(M) Stmt., ¶ 15). Nevertheless, Lacy arrived late for the beginning of his shift at least six times in 1991, (12(M) Stmt., ¶¶ 24–26, 39, 40, 49),[2] and at least ten times in 1992, (12(M) Stmt., ¶¶ 52, 53, 59–61, 63, 66, 68, 71, 74).[3] Lacy was also late returning from his lunch, breaks, or downtime or was otherwise unavailable to take customer calls on at least two occasions in 1991, (12(M) Stmt., ¶¶ 45, 51),[4] and at least eleven occasions in 1992, (12(M) Stmt., ¶¶ 57, 64–67).[5]

On September 10, 1991, Schnaufer and Smith issued Lacy a "counseling statement." (12(M) Stmt., ¶ 41). A counseling statement is a formal written document outlining an employee's performance deficiencies and what action must be taken by the employee to correct those deficiencies. A counseling statement is a serious disciplinary action. (12(M) Stmt., ¶ 30). The September 1991 counseling statement was motivated by Schnaufer's and Smith's belief that Lacy had been absent from work eleven times and tardy from work six times between January 1 and September 1, 1991. (12(M) Stmt., ¶ 41).

In addition to problems with Lacy's punctuality, there were also numerous instances

1. The court notes that the parties have not strictly complied with the local rules. In response to many of the paragraphs in defendant's 12(M) statement, plaintiff often (1) states that he disagrees with the fact averred, but does not cite to parts of the record to support that disagreement; (2) states that he disagrees with the fact averred "except to the extent that it quotes" from a particular exhibit or affidavit; or (3) states that he agrees with the fact averred "except to the extent that Lacy testified that he did not recall the document" or conversation. If a non-movant's response fails to comply with the precise requirements of Local Rule 12(N)(3), the material facts set forth in the 12(M) statement may be deemed admitted. See Valenti v. Qualex, Inc., 970 F.2d 363, 369 (7th Cir.1992). In this case, plaintiff's sometimes-cryptic responses fail to inform the court whether plaintiff admits or denies whether the event or incident in question occurred. In those instances, the court has deemed admitted the corresponding facts.

Defendant has also failed to comply with the local rule. Local Rule 12(N)(3)(b) permits the non-movant to file "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment." Lacy did so. Local Rule 12(M)(3), in turn, provides that the movant may file a concise response to the non-movant's 12(N)(3)(b) statement of additional facts. Ameritech Cellular failed to do so. The court has therefore deemed admitted plaintiff's Statement of Additional Undisputed Facts to the extent that those facts are supported by the record.

2. The 1991 instances of tardiness occurred on April 2, April 10, May 11, September 3, September 6, and November 7.

3. The 1992 instances occurred on January 8, February 5, May 23, May 27, June 1, July 13, July 31, August 25, October 17, and November 5.

4. These instances occurred on October 10 and December 27.

5. These instances occurred on May 11, July 14, July 21 (four instances), July 22 (two instances), July 24, July 31, and August 24.

in which customer service managers spoke to Lacy regarding his handling of customer accounts. For example, on October 14, 1991, Schnaufer spoke with Lacy after monitoring one of his calls. The customer's account showed that the customer owed $302, but the customer informed Lacy that the cellular service had been transferred to another individual. Lacy "dealt" with this problem by telling the customer to send the bill to the individual to whom the service had been transferred. Schnaufer informed Lacy that this was "absolutely intolerable" service and that Lacy "had made no attempt to resolve the issue." (12(M) Stmt., ¶ 46). In a second incident on September 3, 1992, Riordan spoke to Lacy because Lacy failed to "follow up" with a customer by the time he had told the customer he would do so. (12(M) Stmt., ¶ 69).

Finally, Riordan drafted a counseling statement for Lacy dated October 29, 1992 because Lacy had accumulated a large number of absences and tardies in 1992. However, this counseling statement was never issued because it was determined that Lacy would be terminated in the workforce re-sizing. (12(M) Stmt., ¶ 73).

## C. Plaintiff's Application for Promotions and Complaints of Discrimination

Lacy applied for promotions and departmental transfers in May and June 1991. (Am.Compl., ¶¶ 13–14). Smith and Schnaufer told him that he was ineligible to be considered for a promotion in 1991 because he had not been a CSR for one year. (12(M) Stmt., ¶ 107). In addition, Schnaufer also told Lacy in 1991 that Lacy could not apply for a promotion because his performance was not satisfactory, and, after September 1991, because he was on a counseling statement. He was also denied a promotion to the position of Manager, Customer Service on June 16, 1992. (Am. Compl., Exh. A (EEOC Charge)). Schnaufer testified that he told Lacy that "he had to have above average performance in all of the customer service consultant criteria" to be considered for a promotion. (12(M) Stmt., ¶ 108).

Beginning in June 1992, Lacy began complaining to individuals at Ameritech Cellular about discrimination. In June 1992, Lacy told Robert Leger, director of customer service, that African–Americans and male employees were being discriminated against in regard to promotions. (12(M) Stmt., ¶ 129). In July 1992, Lacy met with Fred Fortier, assistant director EEO/AA, and told him that Rita Smith (who is African–American) "favored white employees in terms of promotion." (12(M) Stmt., ¶ 132). In a letter to Fortier dated August 3, 1992, Lacy stated that minorities and men had been discriminated against at Ameritech Cellular in regard to promotions. (12(M) Stmt., ¶ 133).

## D. Workforce Re–Sizing and Lacy's Termination

In mid–1992, Ameritech Cellular's parent company, Ameritech Corporation ("Ameritech"), decided to analyze the performance of its workforce and determine whether employees without the necessary skills and record of performance should be terminated. (12(M) Stmt., ¶ 85). Ameritech articulated detailed criteria and procedures for the selection process. (12(N) Resp., ¶ 86; 12(M) Stmt., ¶ 86). In order to determine the workers to be terminated, Ameritech Cellular first ranked employees in certain salary grades based on their 1991 and 1990 performance reviews. (See Plaint. Exh. 34 ("AMCI Resizing Process" and "Selection Criteria"); 12(M) Stmt., ¶ 87). All Ameritech Cellular CSRs were ranked by the human resources department along with all other employees in salary grades 4–8. (12(M) Stmt., ¶ 93). The number of employees ranked in those grades totaled 358. Fifty-seven CSRs were ranked as part of that group. (12(M) Stmt., ¶ 93).

After the initial rankings were completed, each department was asked to review the rankings. Department managers could move employees up or down on the ranking list based on their 1992 job performance. (12(M) Stmt., ¶ 88). Lacy understood that the determination of whether an employee would be terminated would be based on his job "performance, leadership abilities, skills, and the ability to be a part of the team." (12(M) Stmt., ¶ 89).

In Lacy's department, a meeting was held between Schnaufer, Riordan, Donna Londak, Melissa Nuccio, Minnie Hundley, and Cathy Wagner in the fall of 1992. (12(M) Stmt., ¶90; 12(N) Resp., ¶90). All of the CSRs who received performance rankings of "3" (i.e., unsatisfactory) for 1991 were discussed. The rankings of some of the employees changed as a result of this discussion, based on those employees' performance in 1992. Smith did not make any recommendation regarding the performance of any CSR. (12(M) Stmt., ¶91).

Eleven Illinois CSRs were discussed by the customer service managers because their 1991 performance was rated a "3". The three lowest ranked employees—in descending order—were Lacy, David Pope (African–American), and Janice Elliot–Rivera (African–American). (12(M) Stmt., ¶94). The customer service managers agreed that, based on her 1992 performance, Elliot–Rivera should remain the lowest-ranked CSR. The managers also agreed that Pope's performance had improved in 1992 and that his ranking should be raised. The managers also decided that the performance of a fourth CSR, Jeannette Sielski (white), had deteriorated in 1992 and that her ranking should be lowered. Finally, the managers agreed that no change in Lacy's ranking was warranted based on his 1992 performance. Therefore, after this meeting, the three lowest ranked CSRs were Lacy, Elliot–Rivera, and Sielski. (12(M) Stmt., ¶95). These were the Illinois CSRs that were terminated as a result of the workforce re-sizing. (12(M) Stmt., ¶96).

Lacy was permitted to appeal his termination, which he did on November 16, 1992. Fred Fortier, assistant director EEO/AA, investigated Lacy's appeal and found no evidence to support Lacy's claims. Fortier recommended that Lacy's appeal be denied. James Riecks, director of human resources, denied Lacy's appeal on December 18, 1992. (12(M) Stmt., ¶99).

### E. Smith's Alleged Sexual Harassment

Lacy testified that Rita Smith is the only person at Ameritech Cellular who sexually harassed him. (12(M) Stmt., ¶118). Lacy testified that this harassment began at a meeting in February 1991, in which Smith sat down next to Lacy, touched his arm, and commented on his watch. Lacy has also testified that Smith positioned her chair at this meeting so that her thigh would brush up against his thigh. (12(M) Stmt., ¶119). In March 1991, Smith asked Lacy to come to her office. Behind closed doors, Smith asked Lacy to "express his feelings" and tell her everything he felt about "everything and everybody." (12(N)(3)(b) Stmt., ¶71; Plaint. App., Exh. 2, at 5). In a letter to Ameritech Cellular, Lacy later stated that Smith's "voice tone made [him] very uncomfortable" and that he viewed the words "everything" and "everybody" as slightly suggestive. (Plaint. App., Exh. 2, at 5).

In April 1991, Lacy attended a company-sponsored party at a nearby restaurant. During a conversation with Lacy, Smith asked him if he was married, for how long, and how he had kept his wife "satisfied." (12(M) Stmt., ¶120; 12(N) Resp., ¶120). According to Lacy, Smith also said that if she had enough drinks, she would do "crazy and wonderful things," which Lacy interpreted as a request for sex. Lacy testified that this conversation made him very uncomfortable. (12(M) Stmt., ¶120).

In August 1991, Smith telephoned Lacy from her car phone to discuss why he had abruptly left a company outing at Arlington Park race track. During this conversation, Smith told Lacy that he was a "very interesting man," which made Lacy very uncomfortable. (12(N)(3)(b) Stmt., ¶73). In a meeting on September 10, 1991, Smith told Lacy that if he were friendlier and learned to socialize with his co-workers (including Smith), that things would be better for him. Lacy interpreted these comments as a request for a date and for sex. (12(M) Stmt., ¶121). Lacy also testified that the comments upset him and that he feared that he would lose his job if he did not enter into a social relationship with Smith. (12(M) Stmt., ¶122).

Lacy testified that in March 1992 Smith made similar comments to Lacy about making himself available for social activities with his supervisors and superiors. Lacy also felt that these comments were in reference to sex and were inappropriate and illegal. (12(M)

Stmt., ¶ 123; Lacy Dep., at 486–88). Lacy also testified that in the course of this conversation, Smith told him that if he were to change his views in regard to social relationships with his co-workers, she would be in a position to assist him in advancing at Ameritech Cellular. (Lacy Dep., at 491). Toward the end of this meeting, Smith came from behind her desk with a book in her hand and held it up so that Lacy could read part of it. During this encounter, Lacy testified that the pelvic area of Lacy's body touched that of Smith and that Smith tilted her head up toward Lacy's face "in the same manner a woman would if she wanted you to kiss her." Lacy testified that this encounter made him very uncomfortable. (12(M) Stmt., ¶ 123; Lacy Dep., at 499).

Finally, Lacy testified that he interviewed with Smith for a customer service manager position in May 1992. Allegedly,

> Smith said that she wanted [Lacy] to remember the things that she had told [him] previously about her ability to assist [him] in terms of [his] career, and she repeated the fact that she wanted [Lacy] to think about it carefully and to think about changing [his] view, [his] conservative views about relationships with fellow employees, and she felt that if [he] were to do so, it would go a long way towards [his] being considered for the management position that [they] were discussing.

(12(M) Stmt., ¶ 124).

It is disputed whether Lacy informed Ameritech Cellular of Smith's sexual harassment prior to his termination. (*See* 12(M) Stmt., ¶¶ 125–139; 12(N) Resp., ¶¶ 132, 133, 135).

## F. EEOC Charge and Allegations of the Complaint

Lacy filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 24, 1993. (12(M) Stmt., ¶ 140). Lacy's EEOC charge does not contain allegations that he was denied promotions in 1991 based on his race or sex. (Am. Compl., Exh. A (EEOC Charge)).[6] Plaintiff received a right-to-sue letter on April 29, 1995. (Am.Compl., ¶ 6). On July 26, 1996, plaintiff filed an Amended Complaint alleging sex discrimination, race discrimination, sexual harassment, and retaliation, in violation of Title VII.

## II. Summary Judgment Standards

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c); Cox v. Acme Health Serv., Inc.*, 55 F.3d 1304, 1308 (7th Cir.1995). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir.1995). The movant has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the movant satisfies this burden, the non-movant must set forth specific facts that demonstrate the existence of a genuine issue for trial. *Fed. R.Civ.P. 56(e); Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

Rule 56(c) mandates the entry of summary judgment against a party "who fails to make

---

6. Lacy attempts to refute this fact by relying on a letter that he allegedly wrote to the EEOC in which he notified the EEOC of the 1991 failure-to-promote incidents. (See Plaint. Exh. 29). However, this letter is unsigned and undated and does not contain any stamp or marking indicating that it was received by the EEOC. Lacy has now submitted an affidavit in which he states that he hand-delivered the letter to the EEOC in early 1994. However, even if the court found that this affidavit cured the *evidentiary* defects of plaintiff's Exhibit 29, other problems remain.

Specifically, the letter to the EEOC was not produced to Ameritech Cellular during discovery, in spite of defendant's specific request for the production of documents that relate to plaintiff's employment and to his discrimination claims. For these reasons, the court grants defendant's motion to strike Plaintiff's Exhibit 29. Lacy may not rely on this document to create any genuine issues of material fact. However, the court denies defendant's motion to strike plaintiff's corrections to paragraph 22 of his 12(N) statement.

a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552–53; *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). A scintilla of evidence in support of the non-moving party's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. The question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512.

Finally, these summary judgment standards are applied "with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Collier v. Budd Co.*, 66 F.3d 886, 892 (7th Cir.1995) (citing *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir.1994)). Accordingly, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.*

### III. Scope–of–the–Charge and Statute–of–Limitations Defenses

#### A. 1991 Failure–To–Promote Claims

##### 1. Scope of the Charge

 Defendant first contends that plaintiff's Amended Complaint exceeds the scope of his EEOC charge because the complaint claims for the first time that he was denied promotions in 1991. Defendant therefore argues that summary judgment should be granted as to Lacy's 1991 failure-to-promote claims.

The requirement of filing a charge before the EEOC has two purposes. First, it serves to notify the charged party of the alleged violation. Second, it gives the EEOC an opportunity for conciliation, which effectuates Title VII's primary goal of securing voluntary compliance with its mandates. *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 126–27 (7th Cir.1989). In *Babrocky v. Jewel Food Co.*, 773 F.2d 857 (7th Cir.1985), the Seventh Circuit stated that

"[a]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge." *Id.* at 863. The *Babrocky* court noted, however, "the requirement that the scope of the EEOC charge limit the scope of the subsequent complaint is in the nature of a condition precedent with which litigants must comply rather than constituting a component of subject matter jurisdiction." *Id.*, at 864.

In *Jenkins v. Blue Cross Mutual Hospital Insurance, Inc.*, 538 F.2d 164 (7th Cir.1976), *cert. denied*, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976), the Seventh Circuit concluded that an employee may present claims "like or reasonably related to the allegations of the charge and growing out of such allegations." *Id.*, at 167 (citation omitted); *see also Babrocky*, 773 F.2d at 864; *Schnellbaecher*, 887 F.2d at 127. *Babrocky* states the applicable test:

> All claims of discrimination are cognizable that are " 'like or reasonably related to the allegations of the charge and growing out of such allegations.' " ... The standard is a liberal one in order to effectuate the remedial purposes of Title VII, which itself depends on lay persons, often unschooled, to enforce its provisions.

*Babrocky*, 773 F.2d at 864 (quoting *Jenkins*, 538 F.2d at 167 (citations omitted)); *see also id.* at 864 n. 2 ("[T]he proper inquiry would be into what EEOC investigation could reasonably be expected to grow from the original complaint."); *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1312 (7th Cir.1989) ("[T]he judicial complaint in a Title VII case can embrace not only the allegations in the administrative charge" but also " 'discrimination like or reasonably related to the allegations of the charge and growing out of such allegations.' " (quoting *Hemmige v. Chicago Pub. Sch.*, 786 F.2d 280, 283 (7th Cir.1986))).

In response to defendant's argument regarding the 1991 failure-to-promote allegations, plaintiff argues that those claims fall within the scope of his EEOC charge be-

cause they are "like or reasonably related" to the allegations in the EEOC charge and that an investigation into those claims would grow out of the allegations in the charge that Ameritech Cellular failed to promote plaintiff in 1992. The court agrees. Lacy's EEOC charge included claims related to Ameritech Cellular's failure to promote him in 1992. In investigating such a complaint, it would have been reasonable for the EEOC to also inquire into other incidents in which Ameritech Cellular failed to promote Lacy.

### 2. Statute of Limitations

■ Finding that Lacy's 1991 failure-to-promote claims are "like or reasonably related" to the allegations of his EEOC charge, however, does not necessarily save those claims from summary judgment. In Illinois, a complainant must file a charge of discrimination with the EEOC within 300 days of the allegedly discriminatory act. *42 U.S.C. § 2000e–5(e)(1)*. In this case, Lacy filed his EEOC charge on February 24, 1993. Thus, any claims based on incidents prior to April 30, 1992 (300 days before the EEOC charge was filed) are barred by the statute of limitations. The "like or reasonably related" doctrine does not preclude granting partial summary judgment to the defendant on such time-barred claims because that doctrine does not speak to the applicability of the statute of limitations, but rather to the substantive scope of the lawsuit. *See Luddington v. Indiana Bell Tel. Co.*, 796 F.Supp. 1550, 1565 (S.D.Ind.1990), *aff'd*, 966 F.2d 225 (7th Cir.1992).

In this case, Lacy's 1991 failure-to-promote claims fall outside the 300–day period preceding the filing of the EEOC charge. While those claims may be "like or reasonably related" to those failure-to-promote claims found in Lacy's EEOC charge, Lacy may not rely on the

> "like or reasonably related" standard to work backward in time, thus circumventing the statutory filing deadlines. Carried to its logical extension, [such an] argument would abolish the whole notion of limitations—for any new act of discrimination would dredge up and render actionable

every long-outlawed historical occurrence of the same kind.

*Proffit v. Keycom Elec. Pub.*, 625 F.Supp. 400, 408 (N.D.Ill.1985) (Shadur, J.), *overruled on other grounds, Gilardi v. Schroeder*, 833 F.2d 1226 (7th Cir.1987).

### 3. Continuing Violation

■ Lacy may not save his 1991 failure-to-promote claims from summary judgment by relying on a "continuing violation" theory. In *Stewart v. CPC International, Inc.*, 679 F.2d 117 (7th Cir.1982), the court discussed three continuing violation theories. The first theory stems from "cases, usually involving hiring or promotion practices, where the employer's decision-making process takes place over a period of time, making it difficult to pinpoint the exact day the 'violation' occurred." *Id.* at 120. Courts have tolled the statute of limitations in such cases for equitable reasons similar to those underlying the federal equitable tolling doctrine.

In this case, the first theory is inapplicable. Lacy clearly knew of the asserted violations when he was informed in 1991 that he would neither be promoted nor be allowed to apply for a promotion. Indeed, Lacy has testified that believed that he had been subject to discrimination in May 1991 in connection with his request for a promotion. (*See* Lacy Dep., at 918 (stating that he "felt it was an act of racial discrimination to require something beyond" the written job requirements)). This is not a case in which it was difficult for the plaintiff to pinpoint the exact day on which an alleged discriminatory act occurred. Thus, Ameritech Cellular's "alleged later failure to promote [Lacy] to other positions does not transform its earlier discriminatory act into a 'continuing' violation." *Proffit*, 625 F.Supp. at 408.

The second continuing violation theory stems from cases in which the employer has an express, openly espoused policy that is alleged to be discriminatory. *Stewart*, 679 F.2d at 121. Because Lacy does not allege that Ameritech Cellular had such a policy of discriminating against male or African–

American workers, this theory is also inapplicable in this case.[7]

The third theory grows out of cases in which "the plaintiff charges that the employer has, for a period of time, followed a practice of discrimination, but has done so covertly, rather than by way of an open notorious policy.... In such cases the challenged practice is evidenced only by a series of discrete, allegedly discriminatory, acts." *Id.*; *see also Mack v. Great Atl. & Pac. Tea Co., Inc.*, 871 F.2d 179, 183 (1st Cir.1989) (referring to this kind of continuing violation as a "serial violation"); *Santos v. Rush–Presbyterian–St. Luke's Med. Ctr.*, 641 F.Supp. 353, 357 (N.D.Ill.1986) ("pattern of ongoing discrimination").

In a case in which the third theory is relevant, the plaintiff realizes that he is a victim of discrimination only after a series of discrete acts has occurred. The limitations period begins to run when the plaintiff gains such insight. *Moskowitz v. Trustees of Purdue Univ.*, 5 F.3d 279, 281–82 (7th Cir.1993). "However, if the plaintiff knew, or 'with the exercise of reasonable diligence would have known after each act that it was discriminatory and had harmed' [him], [he] must sue over that act within the relevant statute of limitations." *Jones v. Merchants Nat'l Bank & Trust Co.*, 42 F.3d 1054, 1058 (7th Cir. 1994) (quoting *Moskowitz*, 5 F.3d at 282); *see also Selan v. Kiley*, 969 F.2d 560, 565 (7th Cir.1992) ("Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?")

In this case, Lacy applied for promotions in May 1991 and June 1991. Each time, Ameritech Cellular specifically told him that he was ineligible for a promotion because the company's policy was to prohibit such promotions until an employee had been with the company for one year.[8] Thus, the decision not to promote Lacy in 1991 was a discrete action. Though Lacy now claims that he did not feel that Ameritech Cellular's refusals to promote him were discriminatory in 1991, this is directly controverted by his own deposition testimony. (*See* Lacy Dep., at 918 (stating that he "felt it was an act of racial discrimination to require something beyond" the written job requirements)). Even without this statement, it is clear that Lacy knew, or should have known, that he had not been considered for a promotion and that other individuals had been. This was enough to put Lacy on notice that he had a possible claim. Thus, Lacy may not rely on this, or any, continuing violation theory to revive his 1991 failure-to-promote claims.

### 4. Waiver of Statute of Limitations Defense

■ Finally, plaintiff argues that defendant has waived its right to raise the affirmative defense of the statute of limitations because it failed to include the defense in its Answer to plaintiff's Amended Complaint. Under Federal Rule of Civil Procedure 8(c), a defendant is required to set forth affirmative defenses, including the statute of limitations, in his initial pleading. Some courts, however, have liberalized this pleading requirement by holding that, absent prejudice to the plaintiff, a defendant's failure to raise a statute of limitations defense in the initial pleading does not preclude him from later bringing a motion based on that defense. *See Rivera v. Anaya*, 726 F.2d 564, 566 (9th Cir.1984); *cf. Central States, S.E. & S.W. Areas Pension Fund v. Jordan*, No. 84 C 8666, 1987 WL 17493, at *2 (N.D.Ill.1987) (finding that plaintiff was not prejudiced by allowing defendant to assert statute of limitations defense in its summary judgment motion), *rev'd on other grounds*, 873 F.2d 149 (7th Cir.1989); *see generally* 5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure: Civil 2d § 1278, at 477–505

---

7. In fact, Lacy only alleges that Ameritech Cellular "has followed a practice of discrimination for a period of time, but *done so covertly, rather than by an open and notorious policy.*" (Plaint. Resp., at 4 (emphasis added)).

8. Whether or not this reason was pretextual is irrelevant to the question of whether Lacy was informed and was aware that he would not be promoted.

(1990). Thus, if the defendant asserts the statute of limitations as an affirmative defense before or at trial, it is not waived. *Cf. United States v. DeTar*, 832 F.2d 1110, 1114 (9th Cir.1987) (criminal case).

In this case, Ameritech Cellular did not assert the statute of limitations as an affirmative defense in its Answer. It has, however, raised that defense in its motion for summary judgment. Lacy has not claimed that he was prejudiced by Ameritech Cellular's failure to raise the statute of limitations as an affirmative defense. The court therefore concludes that the defense has not been waived.

For the reasons stated above, the court grants partial summary judgment to defendant on plaintiff's 1991 failure-to-promote claims.

## B. 1991 and March 1992 Sexual Harassment Claims

■ As with his 1991 failure-to-promote claims, defendant argues that Lacy's allegations that Smith sexually harassed in 1991 and in March 1992 are time-barred because they precede April 30, 1992 (i.e., they occurred more than 300 days before he filed his EEOC charge). Unlike the failure-to-promote claims, however, the court finds that Lacy's sexual harassment allegations are not time-barred *to the extent that they relate to his hostile environment claim.*

In the context of a hostile environment action, the failure to file a complaint within 300 days of each alleged sexually hostile act is not fatal to a plaintiff's cause of action. "Acts of harassment that create an offensive or hostile environment generally do not have the same degree of permanence as, for example, the loss of promotion." *Waltman v. International Paper Co.*, 875 F.2d 468, 476 (5th Cir.1989). While each alleged act of sexual harassment may be noticeable, it is the cumulative effect of these discrete acts that creates the allegedly hostile work environment. In recognition of this principle, numerous courts have held that untimely acts of hostile environment sexual harassment should not be dismissed when connected with timely claims of sexual harassment. *See Waltman*, 875 F.2d at 476 (holding that

untimely claims of hostile environment sexual harassment are actionable under continuing violation theory); *Hardy v. Fleming Food Cos., Inc.*, Civ. A. No. H–94–3759, 1996 WL 145463, at *11–12 (S.D.Tex. Mar.21, 1996) (same); *Engelmann v. National Broad. Co., Inc.*, No. 94 Civ. 5616, 1996 WL 76107, at *12–15 (S.D.N.Y. Feb.22, 1996) (same); *Hurley v. Atlantic City Police Dep't*, No. Civ.A. 93–260, 1995 WL 854478, at *7 (D.N.J. Aug.4, 1995) (same); *Jenson v. Eveleth Taconite Co.*, 824 F.Supp. 847, 877–78 (D.Minn.1993) (same); *cf. West v. Philadelphia Elec. Co.*, 45 F.3d 744, 756–57 (3d Cir.1995) (holding that untimely claims of racially hostile environment were actionable under continuing violation theory and stating that "a hostile work environment claim should be addressed in the 'totality of the circumstances'"). *Contra Desrosiers v. Great Atlantic & Pacific Tea Co., Inc.*, 885 F.Supp. 308, 312–13 (D.Mass.1995) (untimely claims of hostile environment sexual harassment known by the plaintiff before the EEOC statute of limitations are not actionable).

In this case, Lacy has alleged that Smith's sexual harassment began in 1991. The incidents that occurred in 1991 were not sufficient, in and of themselves, to constitute hostile work environment sexual harassment. For example, while Smith's positioning of herself next to Lacy in a meeting may have caused Lacy discomfort, he could not have brought an actionable claim based on that incident at the time. Likewise, Smith's comments to him in April 1991 regarding her predilection to do "crazy and wonderful things" when she was drinking are more properly seen as part of an overall pattern of hostile environment sexual harassment. The court therefore concludes that Lacy's pre-April 1992 sexual harassment allegations are not time not time barred to the extent that they relate to his hostile environment claim. If the court finds that there is a genuine issue of fact as to the truth of those allegations, Lacy may then rely on them in an attempt to create a genuine issue of fact regarding his hostile environment sexual harassment claim. However, plaintiff may

not rely on those incidents to support his *quid pro quo* claim.[9]

## IV. Defendant's Substantive Arguments for Summary Judgment

The court now turns to defendant's substantive arguments as to why summary judgment should be granted on each of plaintiff's remaining claims.

### A. Methods of Proof in Employment Discrimination Claims

#### 1. Direct Method

The first method for proving employment discrimination is the "direct" method, which relies on both direct and circumstantial evidence of discrimination. Direct evidence of discrimination is evidence "which can be interpreted as an acknowledgment of discriminatory intent by the defendant or its agents" without reliance upon inference or presumption. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994). In contrast, circumstantial evidence is evidence that provides "a basis for drawing an inference of intentional discrimination." *Id.* Lacy has not elected to prove his discrimination claims using the direct method.

#### 2. Burden-Shifting Method

The alternative, burden-shifting method of proof involves a three-step analytical process. The plaintiff has the initial burden of establishing a prima facie case of discrimination (step one). If a prima facie case is established, a presumption of discrimination arises and the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its action (step two). *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–08, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). If the employer articulates such a reason, the presumption dissolves and the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's proffered reason was a pretext (step three). *Fuka v. Thomson Consumer Elec.*, 82 F.3d 1397, 1404 (7th Cir.1996); *Wolf v. Buss (America), Inc.*, 77 F.3d 914, 919 (7th Cir.1996); *Oxman v. WLS–TV*, 846 F.2d 448, 453 (7th Cir.1988); *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984). Although the burden of production shifts between plaintiff and defendant under this approach, the plaintiff at all times retains the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against him." *Taylor v. Canteen Corp.*, 69 F.3d 773, 779 (7th Cir.1995) (citing *St. Mary's Honor Ctr.*, 509 U.S. at 507, 113 S.Ct. at 2747); *see also Mills v. First Fed. Sav. & Loan Ass'n.*, 83 F.3d 833, 843 (7th Cir.1996).

Generally, to establish a prima facie case of discrimination, a plaintiff must prove that (1) he was a member of the protected class; (2) he was doing his job well enough to meet his employer's legitimate expectations; (3) he suffered from an adverse employment action; and (4) similarly situated employees outside of his protected class were treated more favorably. *Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir.1994); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). However, the elements of a prima facie case are not rigidly established, and may be modified to address the nature of the particular discrimination claim.[10] *See, e.g., Kralman v. Illinois Dep't of Veterans' Affairs*, 23 F.3d 150, 153 & n. 2 (7th Cir.1994).

Pretext, in turn, is more than a mistake; it means "a lie, specifically a phony reason for some action." *Wolf,* 77 F.3d at 919; *Mills,* 83 F.3d at 845. To establish pretext, a plain-

---

**9.** All of the cases that plaintiff cites regarding the continuing violation theory have to do with hostile work environment claims. Indeed, the very nature of *quid pro quo* sexual harassment indicates that a continuing violation theory would be inapplicable to such claims. Under the *quid pro quo* theory, the alleged sexual harasser makes either implicit or explicit sexual demands as a condition for rewards in the workplace. *Dockter,* 913 F.2d at 461. As such, each incident could theoretically constitute a violation of the statute and put the victim on notice of the defendant's illegal conduct (whereas each of the incidents that make up a hostile environment claim may not constitute such a violation).

**10.** For example, in regard to Lacy's failure-to-promote claims, the second and third elements become, respectively, whether plaintiff was qualified for the position for which he interviewed and whether he was promoted.

tiff must "specifically refute the facts which allegedly support the employer's proffered reasons." *Mills,* 83 F.3d at 845 (quotation omitted). A plaintiff may do so directly by presenting evidence that the employer was more likely than not motivated by a discriminatory reason, or indirectly by presenting evidence that challenges the credibility of the employer's explanation.[11] *Id.; Collier v. Budd Co.,* 66 F.3d 886, 892 (7th Cir.1995); *Robinson v. PPG Indus.,* 23 F.3d 1159, 1163 (7th Cir.1994). To challenge the credibility of the proffered explanation under the indirect method, a plaintiff must demonstrate (1) the proffered reasons are factually baseless; (2) the proffered reasons were not the actual motivation for the adverse employment action; or (3) the proffered reasons were insufficient to motivate that adverse employment action. *Wolf,* 77 F.3d at 919; *Collier,* 66 F.3d at 892.

A plaintiff does not attack the credibility of his employer's proffered explanation by showing that his employer acted incorrectly or undesirably in instituting the employment action; rather, the plaintiff must show that his employer did not honestly believe the reasons it gave for taking that action. *Wolf,* 77 F.3d at 919. As a result, challenging the wisdom or prudence of an employer's decision is insufficient to establish pretext because the court

> does not sit as a super-personnel department that reexamines an entity's business decisions. The question is not whether the [employer] exercised prudent business judgment, but whether [the employee] has come forward to refute the articulated, legitimate reasons for his discharge.

*Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986), *cert. denied,* 479 U.S.

1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987). In determining whether the plaintiff has established pretext, the court may consider the sum or totality of the evidence presented. *See Futrell v. J.I. Case,* 38 F.3d 342, 346 (7th Cir.1994).

Finally, a plaintiff must demonstrate that each reason proffered by an employer was a pretext. *See Russell v. Acme–Evans Co.,* 51 F.3d 64, 69 (7th Cir.1995) ("The defendant has offered several independent reasons, backed by affidavits, for each of the challenged [employment] actions. The fact that some of these reasons were successfully called into question ... does not defeat summary judgment if at least one reason for each of the actions stands unquestioned."); *see also Wolf,* 77 F.3d at 920.

**B. 1992 Failure–To–Promote Claims**

▪ Plaintiff claims that he was denied promotions in 1992 in favor of less-qualified white applicants and less-qualified women in violation of Title VII. To establish a prima facie case of race or sex discrimination in a failure-to-promote claim, Lacy must demonstrate that (1) he belongs to a protected group; (2) he performed his current job satisfactorily, applied for the new job, and was qualified for the new job; (3) he was rejected despite his qualifications; and (4) the employer hired someone outside the protected group. *Kirk v. Federal Property Mgmt. Corp.,* 22 F.3d 135, 138 (7th Cir.1994).

The court has already determined that plaintiff's 1991 failure-to-promote claims are barred by the applicable statute of limitations. Therefore, the court will consider only whether plaintiff has made out a prima facie case in regard to his 1992 failure-to-promote claims.[12] Defendant claims that Lacy cannot

---

**11.** A plaintiff must support his allegations of pretext with "materials of evidentiary quality." *Collier v. Budd Co.,* 66 F.3d 886, 892 n. 8 (7th Cir.1995) (quoting *Russell v. Acme–Evans Co.,* 51 F.3d 64, 67 (7th Cir.1995)).

**12.** Even if Lacy's 1991 failure-to-promote claims were actionable, Ameritech Cellular has come forward with a legitimate, non-discriminatory reason for not promoting him. It is undisputed that Schnaufer and Smith told Lacy that Ameritech Cellular had a policy against promoting individuals who had not been with the company

for at least one year. (12(M) Stmt., ¶¶ 106–07). Lacy's argument that the company did not consistently apply this policy (and that Ameritech Cellular's reason is therefore pretextual) is not supported by the evidence. Of the nearly ninety personnel files produced to plaintiff, plaintiff has identified only three employees that appear to have *applied* for new positions before they had been with the company for a year. However, there are no facts to support the conclusion that those three employees actually were promoted or began working in new positions prior to their one-year anniversary. In conjunction with the

establish a prima facie case because Lacy was not performing his present position satisfactorily. Specifically, defendant points to Lacy's "chronic absenteeism, tardiness, and failure to adhere to the scheduled times for taking customer calls and completing paperwork" to demonstrate that Lacy was not performing his present position satisfactorily. (Def. Mem., at 4).

In response, plaintiff contends that he was performing his job satisfactorily, as evidenced by his receipt of numerous commendations and assignment by superiors to high-profile projects. In addition, plaintiff notes that his 1992 evaluation found that he had met or exceeded all of Ameritech Cellular's expectations. (12(N)(3)(b) Stmt., ¶¶ 30–55). Plaintiff argues that these facts create a genuine issue of fact as to whether he was performing his job satisfactorily at the time he applied for promotions in 1992. The court agrees. The Supreme Court has clearly stated that "[t]he burden of establishing a prima facie case ... is not onerous." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Based on the evidence that Lacy was competent in some areas of his job, the court finds that he has established a prima facie case of race and sex discrimination in regard to his 1992 failure-to-promote claims. *See Rush v. McDonald's Corp.,* 966 F.2d 1104, 1114 (7th Cir.1992) (finding that employee had established satisfactory-job-performance element of prima facie case in spite of number of unexcused absences and disciplinary actions because employee had received several positive performance reviews).

Ameritech Cellular argues that Lacy's job performance is nevertheless a legitimate, non-discriminatory reason for not promoting him in 1992. It is undisputed that Lacy was chronically absent, tardy, or away from his cubicle when he was scheduled to be taking customer calls and that he had regularly displayed this behavior over a long period of time. While the court has found that there is a genuine issue as to whether Lacy was performing his job satisfactorily in regard to the second element of his prima facie case, this does not mean that his performance was of the quality to warrant promotion. Indeed, what the facts show is that the quality of Lacy's job performance was highly inconsistent—while Lacy clearly excelled in "saving" accounts and in writing training skits, he was as clearly deficient in other areas of his job.[13] In addition to his poor punctuality, Lacy displayed defects in other areas of his job. For example, in 1991, Schnaufer spoke with Lacy on at least three occasions regarding his inappropriate handling of customer requests. (*See* 12(M) Stmt., ¶¶ 44, 46, 48).[14]

---

fact that plaintiff applied for a promotion nearly *six months* before his one-year anniversary, these facts lead to the conclusion that Lacy was not promoted in 1991 because of Ameritech Cellular's one-year promotion policy, and not because of his race or sex. Plaintiff has come forward with no evidence to suggest that this policy was a pretext for discrimination. In fact, there is no evidence of the race of the individuals (one of whom was a man) who were permitted to apply for promotions prior to their anniversary dates. In addition, it is undisputed that Jerry Kalinsky, a white male employee who held the same position as Lacy and who applied for the same position as Lacy in June 1991, was told that he would not receive the position because he had not been in his position for a year. (12(M) Stmt., ¶ 109). These facts overcome any allegation of pretext.

13. The fact that Lacy gave Ameritech Cellular excuses for his tardiness, absences, and deviations from his work schedule is irrelevant. It is undisputed that Ameritech Cellular required CSRs to follow the schedule (which included showing up for work on time and being "online" when scheduled to do so). (12(M) Stmt.,

¶¶ 8–9). The fact that the myriad of emergencies in plaintiff's life (e.g., home power outages, off-ramp closures, appearances in traffic court, 15-minute trips to the bathroom) required him to be late, to be absent from work, or to deviate from his schedule does not mean that defendant cannot rely on the results of those "emergencies" as a basis for denying Lacy a promotion.

14. Lacy has disputed the facts set forth in paragraphs 46 and 48 of defendant's 12(M) statement. However, much of his disagreement is without merit. Plaintiff does not contend that these incidents did not occur, but (1) argues with the way in which they were characterized by Ameritech Cellular at the time or (2) states that he does not recall the incident. While such disputes might be relevant in determining whether Ameritech Cellular's reasons are *pretextual,* they do not support the conclusion that these events did not occur or that Ameritech Cellular has not articulated legitimate, non-discriminatory reasons for refusing to promote Lacy.

In 1992, Schnaufer met with Lacy to discuss Lacy's failure to complete customer address changes. Later in 1992, Riordan met with Lacy about his failure to "follow up" with a customer by the time Lacy had told the customer he would do so. (12(M) Stmt., ¶¶ 58, 69).

Lacy had also received a written counseling statement in 1991 because of his absenteeism, tardiness, and failure to follow the work schedule. Such counseling statements are considered "serious" disciplinary steps at Ameritech Cellular. In 1992, Lacy was verbally counseled at least twice because he was tardy and/or failed to follow the schedule. (12(M) Stmt., ¶¶ 62, 65). In addition, Riordan drafted a written counseling statement in 1992 that was critical of Lacy's performance and sent him a memo regarding his unsatisfactory performance. While this draft counseling statement was never issued to Lacy, the fact of its existence supports the conclusion that Lacy's job performance was problematic at best. The positive feedback plaintiff received regarding some areas of his work does not demonstrate that defendant had no legitimate reasons for not promoting him.[15] *See Sirvidas v. Commonwealth Edison Co.*, 60 F.3d 375, 378 (7th Cir.1995) ("[I]solated statements referring to some of [plaintiff's] strengths do not demonstrate that he was a stronger performer than other employees in the department.").

The court finds that Lacy's poor performance and attendance are legitimate, nondiscriminatory reasons for denying him a promotion. This conclusion is buttressed by the memo Lacy received from Jim Riecks, director of human resources. That memo outlined the criteria for advancement at Ameritech Cellular, stating that "attendance and punctuality are considered performance factors of the job.... Chronic absence or lateness can affect their performance rating, which eventually affects compensation treatment. Also, attendance is a consideration in deciding among candidates for transfers and

promotions." (12(M) Stmt., ¶¶ 76–77). In addition to the Riecks memo, Schnaufer told Lacy that he had to achieve above-average performance in all of the customer service consultant criteria to be considered for a promotion. (12(M) Stmt., ¶ 108). Furthermore, Robert Leger, director of customer service, informed Lacy in June 1992 "that promotion at Ameritech Cellular was really about excellent performance over a long period of time ... and that [Lacy's] specific performance had not been excellent...." (12(M) Stmt., ¶ 129). The court concludes that defendant has articulated a legitimate, non-discriminatory reason for not promoting Lacy in 1992.

Plaintiff claims that defendant's reason for not promoting him is "suspect and not worth[y] of credence because of all the conflicting evidence concerning Lacy's job performance." (Plaint. Resp., at 10). The court disagrees. In the absence of direct evidence of pretext, Lacy must come forward with evidence demonstrating that (1) the proffered reason is factually baseless; (2) the proffered reason was not the actual motivation for the adverse employment action; or (3) the proffered reason was insufficient to motivate that adverse employment action. *Wolf,* 77 F.3d at 919; *Collier,* 66 F.3d at 892. In this case, Lacy has produced insufficient evidence from which a reasonable trier of fact could conclude that Ameritech's reasons for not promoting Lacy were factually baseless, not the actual motivation for the employment action, or insufficient to motivate the employment action.

For example, while Lacy may be able to rely on the conflicting evidence about his job performance to create a genuine issue of fact as to whether he was performing his job satisfactorily in order to satisfy an element of his prima facie case, he cannot rely on such evidence to establish pretext. *See Gustovich v. AT & T Communications,* 972 F.2d 845, 848 (7th Cir.1992) (material dispute about employee's ability differs from material dis-

---

**15.** The fact that Patricia McGhee, an acting customer service manager, testified that she believed Lacy was competent and that she did not receive any complaints about Lacy while she was an acting supervisor does not mean that Ameritech Cellular had no legitimate reasons for not promoting Lacy. (*See* McGhee Dep., at 30, 44, 47). As the court has noted, the evidence shows that Lacy's performance could, at times, be satisfactory, and even commendable. What matters are not isolated examples of Lacy's performance, but the overall quality of that work.

pute about employer's honesty in its asserted reason for a decision, i.e., the pretext issue); *Anderson v. Stauffer Chem. Co.*, 965 F.2d 397, 403 (7th Cir.1992) ("The fact that an employee does some things well does not mean that any reason given for his firing is a pretext for discrimination."). As the court noted above, what the undisputed facts clearly show is that Lacy's job performance was, at best, highly inconsistent. It is undisputed that Lacy engaged in behavior (i.e., absenteeism, tardiness, deviating from the work schedule) that would have been detrimental to his chances of promotion under the criteria articulated to him by Ameritech Cellular. The fact that Lacy might have been extremely competent in some aspects of his job does not cast doubt on Ameritech Cellular's reasons for not promoting him.

Plaintiff also argues that Ameritech Cellular's reasons are pretextual because it failed to promote any *African–American men* in 1991 or 1992. In essence, Lacy argues that this evidence supports the conclusion that Ameritech Cellular discriminated against African–American males in promotions. While the court recognizes that "race-sex" discrimination *might* be actionable under Title VII,[16] the mere fact that Ameritech Cellular did not promote African–American male CSRs in 1991 and 1992 is not sufficient to show that the company's reason for not promoting Lacy was pretextual.

For the reasons set forth above, the court grants summary judgment on plaintiff's sex discrimination and race discrimination claims regarding defendant's failure to promote him in 1992.

## C. Termination

■ The court finds that Lacy has made out a prima facie case of race and sex dis-crimination in regard to his termination based on the fact that (1) he is a member of a protected class; (2) he was performing his job satisfactorily at the time of his termination (see discussion in *supra* section B); (3) he was terminated; and (4) similarly situated employees of outside of his protected class were treated more favorably. However, as with Lacy's failure-to-promote claims, Ameritech Cellular has presented a legitimate, non-discriminatory reason for the adverse employment action. Specifically, Ameritech Cellular argues that, based on a ranking of all its employees, Lacy ranked near the bottom and that this was the reason for his termination in the re-sizing.

Lacy argues that this reason is not worthy of credence because "[j]ust two months before the reduction-in-force, Ameritech rated Lacy's performance as satisfactory and issued Lacy a commendation. The company states that it terminated Lacy's employment because it had not improved from his 1991 performance. The evidence clearly shows that Lacy's performance had improved." (Plaint. Resp., at 14). The court disagrees with Lacy's characterization. What the evidence shows is that, based on his 1991 and 1990 performance, Lacy was ranked 354th out of a total of 358 employees in salary grades 4–8. Only two other Illinois CSRs were initially ranked lower than Lacy. The customer service managers determined that Lacy's 1992 performance did not warrant a change in his ranking. It is not the court's role to sit as a super-personnel department and second-guess Ameritech Cellular's (and his own supervisors') characterization of Lacy's job performance in 1992.[17] After the

16. Current law is unclear on this question, however. The only case cited by either party indicates that African–American males are not a protected class. In *Degraffenreid v. General Motors Assembly Division*, 413 F.Supp. 142 (E.D.Mo. 1976), *aff'd in part and rev'd in part on other grounds*, 558 F.2d 480 (8th Cir.1977), the plaintiffs claimed that they were discriminated against on the basis of their status as "black women." The court prohibited the plaintiffs from melding two separate statutory remedies into one "super-remedy." *Id.* at 145 (stating that "legislative history of Title VII does not indicate that the goal of the statute was to create a new classification of 'black women' who would have greater standing than, for example, a black male.").

17. The fact that other Ameritech employees were absent or tardy in 1992, but were nevertheless retained in the re-sizing, does not establish pretext. (*See* 12(N)(3)(b) Stmt., ¶ 77 (Errata)). The employees to which plaintiff refers did not appear to have as severe of a problem regarding adherence to the work schedule as did plaintiff. (*See, e.g.,* Plaint. Exh. 41 (indicating that Mike Roller had 5.5 absences and no tardies)). In addition, plaintiff has presented no evidence re-

customer service managers made the necessary changes in the rankings, the three lowest-ranked CSRs were terminated. These facts support Ameritech Cellular's non-discriminatory reason for Lacy's discharge.

Lacy has come forward with no evidence to suggest that this reason was a pretext for his discharge. As stated *supra*, to attack the credibility of an employer's proffered explanation, a plaintiff must demonstrate (1) the proffered reasons are factually baseless; (2) the proffered reasons were not the actual motivation for the adverse employment action; or (3) the proffered reasons were insufficient to motivate that adverse employment action. *Wolf*, 77 F.3d at 919; *Collier*, 66 F.3d at 892.

In this case, Lacy's low ranking is clearly based on fact. It is undisputed that Lacy was chronically tardy or absent and often deviated from his work schedule without permission. It is also undisputed that Lacy mishandled customer accounts. These are sufficient facts upon which to base Lacy's low ranking. Lacy has also not demonstrated any genuine issue of fact that his ranking was not the actual motivation for his discharge. He has come forward with no facts to demonstrate how defendant selected employees for termination in the re-sizing. On the other hand, defendant has come forward with substantial, largely undisputed, evidence regarding its process for ranking employees, adjusting their ranks, and selecting employees for discharge. As a result, defendant has more than met its burden of showing that Lacy's job performance was the sole motivation (and a sufficient motivation) for his discharge.[18]

**D. Hostile Environment Sexual Harassment**

■ It is settled that Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult. *Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399,

2405, 91 L.Ed.2d 49 (1986). Therefore, sexual harassment that creates a hostile and abusive work environment is a form of employment discrimination prohibited by Title VII. *Id.* at 65–66, 106 S.Ct. at 2405; *Swanson v. Elmhurst Chrysler Plymouth, Inc.*, 882 F.2d 1235, 1238 (7th Cir.1989). A "hostile work environment" arises if the alleged sexual harassment " 'has the purpose or effect of . . . creating an intimidating, hostile, or offensive work environment.' " *Dockter v. Rudolf Wolff Futures, Inc.*, 913 F.2d 456, 459 (7th Cir.1990) (citation omitted).

The Supreme Court has stated, however, that not all inappropriate behavior in the workplace is tantamount to a hostile environment; in order for the behavior to be actionable, the plaintiff must prove that it is "sufficiently severe or pervasive 'to alter the terms or conditions of [the plaintiff's] employment and create an abusive working environment.' " *Id.* (quoting *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405). In determining whether the alleged conduct rises to this level, a district court must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993). The Seventh Circuit has stated that district courts should use both an objective and subjective analysis in " 'considering the likely effect of a defendant's conduct upon a reasonable person's ability to perform his or her work and upon his or her well-being, as well as the actual effect upon the particular plaintiff bringing the claim.' " *Dockter*, 913 F.2d at 459 (quoting *Brooms v. Regal Tube Co.*, 881 F.2d 412, 419 (7th Cir.1989)).

In this case, even if Smith engaged in all of the behavior that Lacy alleges, those alleged comments and actions would not bring about a "hostile work environment" as that term is understood under Title VII jurisprudence.

---

garding how those employees performed in other areas of their jobs.

**18.** Ameritech Cellular's other actions during the re-sizing indicate that its reasons for terminating plaintiff were not pretextual. For example, the

customer service managers raised the ranking of another African–American male CSR (David Pope), while lowering the ranking a white female CSR (Jeanette Sielski).

The behavior that Smith engaged in was not sufficiently severe or pervasive to alter Lacy's employment conditions or to interfere unreasonably with his work performance. Under similar facts, the Seventh Circuit has come the same conclusion. For example, in *Weiss v. Coca–Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir.1993), the Seventh Circuit found no actionable sexual harassment is cases where a supervisor asked the plaintiff for dates, put his hand on her shoulder several times, placed "I love you" signs in her work area, and attempted to kiss her in a bar. Similarly, in *Saxton v. American Telephone & Telegraph Co.*, 10 F.3d 526, 528, 534–35 (7th Cir.1993), the court found no actionable sexual harassment where a supervisor placed his hand on the plaintiff's leg above the knee several times, rubbed his hand along her inner thigh once, and pulled her into a doorway and kissed her for two or three seconds. Finally, in *Baskerville v. Culligan International Co.*, 50 F.3d 428, 431 (7th Cir.1995), the court found no hostile work environment where the alleged sexual harasser never (1) touched the plaintiff, (2) invited her (either explicitly or implicitly) to have sex with him or go on a date with him, (3) threatened her, (4) showed her dirty pictures, or (5) "said anything to her that could not be repeated on primetime television."

■ In this case, Smith's allegedly sexually harassing behavior occurred in a relatively small number of isolated incidents. Furthermore, much of the behavior was ambiguous and not clearly sexual in nature. As stated *supra*, the court must consider Smith's behavior in light of how it might affect a reasonable person in the same situation. Given the sporadic occurrence and relative harmlessness of the conduct in question, the court concludes that there is no genuine issue of fact as to whether Smith's conduct created a hostile work environment. *See Saxton*, 10 F.3d at 533–34 (finding that "relatively isolated" instances of non-severe misconduct did support hostile environment claim). The court therefore grants summary judgment in favor of Ameritech Cellular on Lacy's hostile environment claim.[19]

### E. *Quid Pro Quo* Sexual Harassment

The *quid pro quo* theory of sexual harassment applies to situations in which submission to sexual demands is a condition of tangible employment benefits. *Dockter*, 913 F.2d at 461 (citation omitted). In *Bryson v. Chicago State University*, 96 F.3d 912 (7th Cir.1996), the Seventh Circuit noted that the EEOC has described *quid pro quo* sexual harassment as follows:

"Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment" [or] "[ (2) ] submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual."

*Id.* at 915 (quoting EEOC Guidelines on Sexual Harassment, *29 C.F.R. § 1604.11(a)).*

---

**19.** Even if Smith's actions created a hostile work environment, Ameritech Cellular would not be liable for those actions. In *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 320 (7th Cir.1992), the court held that employers are not strictly liable under Title VII for sexual harassment engaged in by their employees. Rather, the question of liability is decided under negligence principles. "An employer is liable for such harassment only 'if the employer knew or should have known about an employee's acts of harassment and fails to take appropriate remedial actions.'" *Id.*, at 320 (quoting *Brooms v. Regal Tube Co.*, 881 F.2d 412, 420 (7th Cir. 1989)). The facts of this case do not demonstrate that defendant should have known about Smith's conduct. The only evidence of defendant's actual knowledge of Smith's harassment is an August 2, 1992 conversation (which is disputed) in which Lacy allegedly told Fred Fortier that Smith was "harassing" him. (12(M) Stmt., ¶ 132; 12(N) Stmt., ¶ 132). However, Lacy did not inform Fortier that this "harassment" was of a sexual nature. In fact, the next day, Lacy sent Fortier a letter stating that minorities and men had been discriminated against at Ameritech Cellular. That letter utterly failed to mention that he was being sexually harassed by Smith. Furthermore, in all of the other conversations that Lacy had with Fortier and Robert Leger, he never mentioned any "harassment" of any kind. The court finds that Lacy has come forward with only a "scintilla of evidence" to show that defendant knew or should have known about Smith's acts of harassment. The court concludes that defendant would not be liable to Lacy under a hostile environment theory.

Under a type (1) *quid pro quo* claim, it would appear that a plaintiff need not establish a causal connection between submission to or rejection of sexual demands or advances and an employment decision. The Supreme Court has noted that the EEOC "Guidelines, while not controlling upon the courts by reason of their authority, do constitute of body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor*, 477 U.S. at 65, 106 S.Ct. at 2404 (quoting *General Elec. Co. v. Gilbert*, 429 U.S. 125, 141–142, 97 S.Ct. 401, 410–11, 50 L.Ed.2d 343 (1976)).

Despite this language, courts have generally evaluated all *quid pro quo* claims under a burden-shifting framework in which the plaintiff must demonstrate a causal connection between the reaction to the supervisor's advances and a tangible employment benefit. In *Bryson*, the court recognized the five-part prima facie test that had been adopted by most courts,

> (1) that she or he is a member of a protected group, (2) the sexual advances were unwelcome, (3) the harassment was sexually motivated, (4) the employee's reaction to the supervisor's advances affected a tangible aspect of her employment, and (5) respondeat superior has been established.

*Bryson*, 96 F.3d at 915 (citing cases). The court noted that this test "provide[d] a useful framework for [its] discussion" of *quid pro quo* sexual harassment. *Id.* at 916. For purposes of evaluating Lacy's *quid pro quo* claim, this court also adopts the five-part prima facie test set out above. *Cf. Rushing v. United Airlines*, 919 F.Supp. 1101, 1109 (N.D.Ill.1996) (setting out a similar, three-part test).

■ While this court has found that Lacy could rely on his pre-April 1992 allegations of sexual harassment to support his hostile environment claim, he may not use those allegations to support his *quid pro quo theory*. *(See supra* note 9). Only one alleged incident of *quid pro quo* sexual harassment that occurred after April 30, 1992 (300 days prior to the filing of the EEOC charge) is properly in the record before the court—the May 1992 interview in which Smith told Lacy that he should reconsider his views on relationships with fellow employees.[20]

The court finds that a reasonable jury could conclude that Smith's statements during the May 1992 interview with Lacy were sexual demands. Smith allegedly told Lacy that she wanted him to remember the things that she had previously told him about her ability to assist him in his career. (12(M) Stmt., ¶ 124). In previous conversations, Smith had made it clear that she wished Lacy to engage in more personal and social interaction with his co-workers, including her. (*See, e.g.*, 12(M) Stmt., ¶ 121). The court finds that, in the context of the previous conversations between Smith and Lacy, a trier of fact could interpret Smith's statements during the May 1992 interview as an offer of tangible employment benefits in exchange for sexual favors.

■ Lacy must also show that he suffered an adverse employment consequence as a result of his refusal to submit to Smith's demands. In this case, Lacy alleges that he suffered two kinds of adverse employment actions—denial of promotions and termination.[21] To establish a causal link between the adverse employment decisions and sexual harassment, Lacy must show that Smith made or substantially affected the decisions.

---

**20.** During the course of that interview, Smith referred to previous conversations that she had had with Lacy regarding how she might be able to help him advance at Ameritech Cellular. While the court has held that Lacy may not specifically rely on those incidents to make out his *quid pro quo* claim, the court nevertheless finds that he may still rely on what was said during those pre-April 1992 incidents to give content to Smith's statements in May 1992.

**21.** Lacy's Amended Complaint also complains about being "demoted." This is evidently a ref-

erence to the alleged removal of plaintiff as leader of the "save" team. (*See* Am. Compl., ¶ 17). In his response brief, plaintiff makes no argument regarding this "demotion." In addition, plaintiff has come forward with no evidence regarding the facts behind this "demotion." Furthermore, there is no evidence that leaders or members of the "save" team received any extra remuneration. The court therefore concludes that Lacy's removal from the "save" team was not an adverse employment action.

See, e.g., *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir.1994) (in retaliation context); *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1564–65 (11th Cir.1987). Lacy has carried this burden. Smith clearly was involved in the decision not to promote Lacy. In addition, while Smith was not involved in the re-ranking of CSRs during the fall 1992 meeting, there is sufficient evidence to conclude that she was involved in the decision as to which CSRs to recommend for termination.

■ As with Lacy's other claims, however, Ameritech Cellular has come forward with legitimate, non-discriminatory reasons for the adverse employment actions. Defendant has demonstrated that plaintiff was not considered for promotions because of its one-year policy and because of plaintiff's poor performance. Defendant has also demonstrated that it terminated plaintiff as part of a company-wide workforce resizing. Plaintiff was chosen for termination based on his low ranking (which was in turn based on his poor performance). *See Dockter*, 913 F.2d at 461 (finding no *quid pro quo* sexual harassment where employee was terminated because of inability to become proficient as an operator of IBM personal computer). Plaintiff has come forward with no other evidence to suggest that his refusal to submit to Smith's sexual demands was the real reason for the adverse employment actions. Rather, plaintiff merely states that "[w]hen he declined [Smith's advances], he suffered adverse employment consequences." While the court recognizes the temporal correlation between these events, such a correlation is not enough to show that Ameritech Cellular's reasons were pretextual.

## F. Retaliation

■ Lacy also argues that Smith denied him promotions and terminated him in retaliation for complaining about Smith's racial and sex discrimination and sexual harassment. Ameritech Cellular argues that summary judgment is warranted on these claims because Lacy cannot establish a causal connection between any statutorily protected activity and not being promoted and/or being terminated. Furthermore, defendant argues that Lacy cannot establish that defendant's articulated reasons for denying him promotions or terminating him were pretextual.

The plaintiff proves a prima facie case of retaliation by demonstrating that: 1) he engaged in statutorily protected activity; 2) he suffered an adverse action; and 3) there is a causal link between the protected activity and the adverse action. *Essex v. United Parcel Serv.*, 111 F.3d 1304, 1309 (7th Cir. 1997). The court finds that Lacy has established a prima facie case of retaliation. Specifically, the court finds that Lacy has demonstrated an inference of a causal connection between his protected activity and an adverse employment action. Lacy began complaining of discrimination in the summer of 1992. Shortly thereafter, Smith and Lacy's supervisor (Riordan) were in a position to make decisions affecting Lacy's employment.

■ Again, however, Ameritech Cellular's non-discriminatory reasons for terminating Lacy, and Lacy's inability to establish pretext, warrant granting summary judgment on Lacy's retaliation claim. *See supra* discussions in Sections B–E. Lacy's subjective belief that his termination was retaliatory and that the claimed reasons were pretext does not alone create a genuine issue of material fact. *See McMillian v. Svetanoff*, 878 F.2d 186, 191 (7th Cir.1989); *Pilditch v. Board of Ed. of the City of Chicago*, 3 F.3d 1113, 1119 (7th Cir.1993).

For the reasons stated above, defendant Ameritech Mobile Communications, Inc.'s motion for summary judgment is GRANTED. Defendant's motion to strike is GRANTED IN PART and DENIED IN PART. Plaintiff's motion for leave to file instanter plaintiff's errata is GRANTED. Plaintiff's motion for leave to file instanter his supplemental affidavit is GRANTED.